UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KEESHANN JONES, et al,

                 **Plaintiffs**

      v.                               Case No. 1:12-cv–946-HJW

MARK MCGRATH, et al.,

                 **Defendants**

### ORDER

Pending is the defendants' "Motion for Summary Judgment" (doc. no. 40), which the plaintiffs oppose. The defendants have submitted proposed findings of fact and conclusions of law, which the plaintiffs have highlighted as true, false, or irrelevant (doc. no. 52). The Court held a hearing on July 16, 2014, at which counsel presented oral arguments. Having fully considered the record, including the parties' briefs, exhibits, proposed findings, oral arguments, and applicable authority, the Court will <u>grant</u> the motion for the following reasons:[1]

### I. Background

The pertinent facts are largely straightforward, and any disputed characterizations will be noted herein.[2] Mr. Mark McGrath is a licensed real estate broker who manages a variety of rental properties for different owners. He has done so on a professional basis for over twenty years through his company Home

---

[1] For clarity's sake, the Court will cite to the page numbers in the docket, rather than citing a document's internal page numbers.

[2] Plaintiffs have red-lined as "disputed" various correct facts in the Proposed Findings because they are disputing the legal implications of those facts, not the facts themselves.

Information Network, Inc. Approximately 65% of the persons he leases property to (over 130 tenants) are "persons of color." He has not had previous complaints of discrimination filed against him. In 2010, his clients Mr. and Mrs. Patel owned a 4-bedroom home located at 923 Pond Court, Lebanon, Ohio.[3] The Patels wanted to sell or lease the house. On April 23, 2010, they signed an Exclusive Listing Contract ("listing") with Home Information Network, valid through July 24, 2010 (doc. no. 43, Plaintiffs' Ex. 2). The home was listed at $209,900.00 for purchase. The listing contract indicated that the realtor was also authorized to use his "best efforts" to obtain a qualified tenant for a one year lease. The Patels preferred to sell the home, or alternatively, lease it with a purchase option. They would consider renting it, but this was the least desirable option for them. Mr. Patel informed Mr. McGrath that he would prefer someone who was interested in actually purchasing the property.[4] In the event of a lease, the listing indicated the tenant would be responsible for monthly rent and utilities (gas, electric, water, sewer, and garbage removal), as well as maintenance of the interior and exterior.

On June 4, 2010, realtor Sara Buck emailed Mr. McGrath a rental application on behalf of her clients, James and Keeshann Jones. Ms. Buck had showed them the house. She FAXed her own forms, rather than the application form used by

---

[3] Although plaintiffs "dispute" that the 'property has four bedrooms" (doc. no. 52 at 5, Proposed Findings, ¶ 10), the listing plainly shows 4-bedrooms (doc. no 40, Ex. 4). Plaintiffs have pointed to no evidence suggesting otherwise, and in fact, acknowledge in their brief that the house has four bedrooms (doc. no. 48 at 8).

[4] Although plaintiffs "dispute" this, Mr. McGrath has consistently so testified (2013 McGrath Dep., doc. no. 43 at 93; 2014 McGrath Dep., doc. no. 38 at 40). Plaintiffs have pointed to no evidence to the contrary.

Home Information Network. The forms were incompletely filled out. Plaintiffs indicated they had a bank account at Huntington Bank, but left the lines blank for the account number. Under "credit references," they listed several credit cards and their auto lender, but omitted the requested contact information. In her email, Ms. Buck asked if the rental price ($1,850 per month) was "negotiable" (doc. no. 38 at 87). That day, Mr. McGrath provided Ms. Buck with the correct application form, and requested that the Jones complete and return it. He also indicated he would check with the Patels about some repair items, including improving "the lower level bathroom with an installed sink & toilet" (Id., copy of email and response).

Through Ms. Buck, the Jones also submitted an incomplete two-page form (which was not the form used by Mr. McGrath) (2014 McGrath Dep., doc. no. 38 at 32 "she returned her application, not mine"). They omitted contact information for their current landlord, even though the form asked for this information in two places. Mr. McGrath noted this omission on the printed copy of Ms. Buck's email (Id. at 87). The Jones also left blank their reason for leaving their current rental and their length of residence there. They left blank the spaces for account information for their credit cards. They listed monthly income of $3,200.00 before taxes from Mr. Jones' job and $3,909.00 per month from Children Services (for caring for six foster children). The Jones indicated they had a total of nine children currently living with them. No employment was listed for Mrs. Jones (Id. at 90, indicating "wife job between").

The Jones attached a letter explaining the debt collection problems reported

on their credit history (doc. no. 48-7 at 2, ¶ 12 indicating they were writing the letter to explain "the items on our credit history"). They indicated that as of 2010, they had now paid various past-due bills that had been in collection, including some medical bills they were "unaware" of until they obtained a copy of their credit report. Plaintiffs attached five letters from several collection agencies (American General Financial Services and FCC Columbus, Inc.) regarding past due bills that had been in collection. Plaintiffs also attached a bill from "Lowe's/GEMB" addressed to Keeshann Jones at a post office box. The bill reflects a payment due date of 6/15/2010 and the amount "$4003" hand-written in the space for "payment enclosed."[5] Plaintiffs also provided a copy of part of a receipt from a clothing store ("Maurices") indicating "MCC Payment." The account number, due date, and amount of payment are not visible on the copy.

In their letter, the Jones further explained that they had been unable to afford the monthly mortgage payment on their five bedroom home, were unable to obtain refinancing, and (after foreclosure proceedings were filed against them in 2003) had provided Wells Fargo with a "deed in lieu of foreclosure." They indicated "currently, we are trying to rebuild our credit that has been damaged by this process." They subsequently rented a house in Lebanon, Ohio. On their application to rent the Patels' house, they left blank several requests for information, including: "How long?" (at the prior rental) and "Reason for leaving."

---

[5] The attached copy was only part of the bill and does not indicate the balance due, payment history, or that the bill was paid in full.

4

The Jones indicated they currently owed approximately $43,000.00 to several creditors, including $17,000.00 for a time share and "about $20,000" on a loan for a 2009 Charger automobile (doc. no. 38 at 91). They listed several additional creditors on the two-page form that they did not list on the one-page form.

Mr. McGrath indicates that upon receiving all this information from Ms. Buck (just prior to going on vacation for a week), he followed the same procedure he uses for every residential lease application. Home Information Network has a written list of "Criteria for Rental Approval," which provides:

> The following sources are used to qualify tenants who complete and sign the rental application:
> 1) At least 1 year time on job
> 2) Favorable reference from current landlord if tenant is currently renting
> 3) Satisfactory credit as provide by tenant or through credit report
> 4) Satisfactory walk through of current residence

(doc. no. 38 at 107). The list indicates that steps one and two are required, and that steps three and four may also be considered. The list also refers to additional factors for consideration, such as pets, smoking, negative comments about the property, past evictions, and felony convictions.[6] Home Information Network

---

[6] Although plaintiffs "dispute" that Mr. McGrath followed his "usual procedure," the record reflects that he followed the criteria set forth on this list, which was provided to the OCRC early in the state case. He indicates he viewed Mr. Jones' 15 year employment history favorably, and that he checked with the Jones' current landlord. The Jones had provided information about their credit (including collection letters regarding payment of past due bills), and Mr. McGrath did not run a credit report. At the fourth step, he asked for a "walk through of current residence." He indicates that in light of the unusually large number of proposed tenants and the presence of a dog, he was concerned about wear and tear on the Patels' house, as well as any pet damage.

indicates its "objective is to qualify tenants based on their ability to consistently pay rent on time as agreed in rental agreement and their ability to maintain the premises in a safe and orderly condition" (Id.). Mr. McGrath indicates he typically reviews the application, verifies the applicant's employment, calls the current landlord, and checks on the court website to see if there is any "litigation or criminal activity associated with the applicant" (doc. no. 40 at 3; McGrath Aff. ¶ 11).

When he reviewed the plaintiffs' application, he noted the missing information,[7] as well as the attached collection letters and the plaintiffs' own letter about the debt collection problems on their credit history.[8] He also noted that the Jones were wanting to put 11 people in a 4-bedroom house (although they previously lived in a 5-bedroom house), which he indicates immediately raised concerns about possible overcrowding and wear and tear on the Patels' house. Mr. McGrath wrote a note on Ms. Buck's email that the plaintiffs' application was missing "current landlord contact info." He also noted "Smoking?" which is presumably a reference to his need to find out if these prospective tenants smoked. He also circled the fact that the plaintiffs had a dog.

Mr. McGrath obtained the telephone number for the Jones' current landlord

---

[7] Although he had sent the correct application form to Ms. Buck and specifically requested that the Jones complete and sign it, they did not do so. The record only reflects Ms. Buck's own forms, which were incomplete. Regardless, Mr. McGrath proceeded to consider their application.

[8] Although plaintiffs "dispute" that in "reviewing the application, Mr. McGrath noticed that Plaintiffs had a number of debts that went to collection agencies" (doc. no. 52 at 6, ¶ 15), it is undisputed that plaintiffs attached multiple collection letters to their application, which Mr. McGrath reviewed.

(Mark Armstrong) and spoke with him by phone. Mr. McGrath wrote notes on the Jones' application about information he learned in this conversation. He noted "not ok, some late pays" (doc. no. 38 at 91).[9] He also spoke with the Jones. He noted that their reason for leaving their current rental was "problems in house," that they were currently paying $2,300 in monthly rent, that they were moving out of that rental after only "1 yr. 1 mos." (Id. at 37 "they said there's some mold in the bathroom"). When he checked for any litigation or criminal history, he found various filings associated with the foreclosure proceedings against them, as well as more recent tax delinquency (doc. no. 43, Ex. 7, Complaint for Foreclosure filed 08-28-2003; Judgment Entry and Decree of Foreclosure filed 03-04-2003; Notice of Sheriff's Sale for Foreclosure on 05-22-2003; Complaint for delinquent real estate taxes filed January 4, 2008).[10]

Given all this information, Mr. McGrath indicates he was concerned about the plaintiffs' reliability in making payments. He was also concerned about the large number of people and resulting excessive wear and tear on the house, which

---

[9] It is undisputed that Mr. McGrath wrote this on the application. Plaintiffs contend that they had merely asked to split their rent payment in two on several occasions. Mr. McGrath apparently equated this with "slow pay" and/or "late pay."(Id. at 79, ¶ 20 indicating he learned that the Jones had "requested permission to pay their rent late on multiple occasions").

[10] Plaintiffs red-line as "disputed" the assertion that "Mr. McGrath checked the court website to see if Plaintiffs had any record of litigation or criminal activity ... litigation activity he found there was associated with a foreclosure problem that plaintiffs had" (doc. no. 52, Proposed Findings ¶ 17). Merely underlining this factual assertion creates no genuine dispute of material fact. Mr. McGrath testified that he checked the court website, and the exhibits in the record reflect the foreclosure filings (doc. no. 43, Ex. 7). The Jones describe their past foreclosure problems in their own letter.

his client preferred to sell (2013 McGrath Dep. at 92 "as far as the number of occupants in the house ... I knew it was a concern. And it would be a concern for the owner as well" and at 93, indicating that Mr. Patel "was concerned about the number of occupants").

When Mr. McGrath met with the Jones at the Pond Court residence to review the application with them (doc. no. 48-6 at 2, Jones Aff. ¶ 15), he verified that they were non-smokers and that they had a dog. Plaintiffs specifically told him they were not interested in buying the house. They had indicated on their application that they were interested in a two year lease and a month-to-month arrangement after that. As the listing authorized him to use his best efforts to obtain a tenant for a one year lease, Mr. McGrath asked them if they would be interested in a lease shorter than two years. Although their application had not yet been approved, the Jones had apparently assumed (based on their conversation with their own realtor) that they would "finalize" matters that day (doc. no. 48-6, J. Jones Aff. ¶ 11 "I believed that I would be signing a lease that day").[11] Mr. McGrath, however, had

---

[11] In her declaration (doc. no. 48-8 at ¶¶ 16-18), Mrs. Jones attempts to use hearsay statements (about what her realtor allegedly said Mr. McGrath allegedly said) to prove the truth of the matter asserted, i.e. that he was going to approve their rental application. Fed.R.Civ.P. 56(c)(4) requires that affidavits be based on personal knowledge, not hearsay statements. See, e.g., Basinger v. CSX Transp., Inc., 1996 WL 400182, *6 (6th Cir. (Ohio)), cert. denied, 519 U.S. 1111 (1997) ("inadmissible hearsay evidence in an affidavit will not defeat summary judgment"). It is well-settled that inadmissible hearsay may not be considered on summary judgment review. See Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009) (only admissible evidence may be considered); White v. Ohio, 2 Fed. Appx. 453, 459 (6th Cir. 2001) (affirming exclusion of hearsay); Ky. v. Louis Trauth Dairy, Inc., 1998 WL 199717, *7 (6th Cir. (Ky.)) (affirming exclusion of hearsay).

not told the Jones their application was approved. He requested to view their current rental. Plaintiffs agreed to this, and they viewed the premises together. After speaking further with the Patels, Mr. McGrath indicated on June 16, 2010 that the Jones' rental application was declined. He recorded in his notes: "declined, walk through of current rental - poor condition" and "several late payments, slow pay" on Ms. Buck's email (doc. no. 38 at 87). When he called the Jones to advise their application was declined, he also mentioned the "items" on their credit report, i.e. their history of debts in collection and other financial problems.

Subsequently, an agent for a married couple from Michigan (the "Rainwaters") inquired about a one-year lease of the house (doc. no. 38 at 54, 56). Mr. McGrath was not aware of their race. As he did for the Jones, he provided them with information about leasing the property. The Rainwaters did not follow through due to a job change. Another married couple ("the Kirkwoods") thereafter inquired about the house and specifically indicated they were interested in purchasing the property, which was an important factor to the Patels. Although this couple (Caucasian, two children) had a prior bankruptcy, their application to lease the property with a purchase option was eventually approved, and they did in fact purchase the home with financing from a traditional lender (Id. at 65).[12]

Meanwhile, in September 2010, the Jones complained to "Housing

---

[12] Although plaintiffs "dispute" that "the Kirkwoods expressed immediate interest in a purchase option"(Proposed Findings ¶ 52), the evidence reflects that the Kirkwoods submitted a complete Home Information Network application form and entered a lease with a purchase option. They subsequently bought the house. Plaintiffs have pointed to no evidence to the contrary.

Opportunities Made Equal, Inc." ("HOME"), an organization that tests fair housing compliance "by assigning two of its testers to inquire about the availability of a house" (doc. no. 48-2 at 2). On September 17, 2010, HOME sent Elbert Lewis (age 63, African-American male) to inquire about another house that Mr. McGrath was advertising for sale at 413 N.Section Ext., South Lebanon, Ohio. On September 23, HOME sent Jamie Hoffpauir (age 45, Caucasian female) to inquire about the same house. The testers reported that they were both given prompt appointments, treated in a professional and courteous manner, shown the house, and given informative answers in response to their questions. They both received followed up phone calls afterwards. No remarks of any kind were made that would permit any inference of discrimination. This did not satisfy the Jones, who were "upset" that their rental application had been declined (doc. no. 48-5, J. Jones Aff. ¶ 26).

The Jones filed a state housing discrimination charge with Ohio Civil Rights Commission ("OCRC") on October 12, 2010. The OCRC's preprinted "conciliation agreement" would have required the defendants to pay "actual, compensatory, and punitive damages" and attend "Fair Housing Training" (Plaintiffs' Ex. 16). Defendants maintained that they had not discriminated against the plaintiffs and elected to have the matter addressed in a civil action (doc. no. 57, Ex. B). On May 3, 2012, a civil action was filed in the Warren County Court of Common Pleas, Case No. 12-cv-81987 (doc. no. 8-1 at 7).

While the state case was pending, plaintiffs filed a complaint in federal court on December 7, 2012, asserting causes of action under 42 U.S.C. §§ 1981, 1982,

10

3604(a) and Ohio R.C. § 4112.02(H). Plaintiffs subsequently amended their complaint to allege a single claim under § 3604 of the FHA (doc. no. 20 at 5, ¶ 37). Plaintiffs seek compensatory and punitive damages, costs, and attorney fees.

After discovery concluded in the state case,[13] and just weeks before the scheduled hearing on the fully-briefed motion for summary judgment, the OCRC voluntarily dismissed the state case on June 5, 2013 (doc. nos. 17, 18, "Notices" of dismissal). Meanwhile, in the federal case, the defendants had moved to dismiss based on *Younger* abstention and the two years statute of limitations (plaintiffs had filed their federal lawsuit two and a half years after their application was declined). In light of the dual enforcement structure of the FHA, the Court found that *Younger* abstention did not apply. Plaintiffs also now indicated for the first time (in response to the Court's show cause order) that they had in fact initially filed a HUD complaint which had been referred to the OCRC. Given that HUD's letter to the plaintiffs about tolling and the two year time limit was arguably ambiguous, the Court declined to dismiss the case as time-barred.

After discovery concluded on February 14, 2014 in the federal case, the defendants moved for summary judgment. After additional extensions of time, plaintiffs filed a response with some attached exhibits (including the two HOME tester reports from 2010 and related affidavits dated May 1, 2014). Defendants moved to strike those exhibits, arguing that plaintiffs had not disclosed this evidence prior to the discovery deadline, had violated the discovery rules, and

---

[13] Mr. McGrath was deposed in 2013 for the state case and again in 2014 for the federal case.

should not be permitted to rely on this belated evidence (doc. no. 51). The defendants further asserted that even if considered, the belated evidence was of little significance because it reflected no discriminatory behavior by Mr. McGrath and created no genuine disputes of material fact in this case. On July 16, 2014, the Court held a motions hearing, at which respective counsel presented oral arguments. The motions are fully briefed and ripe for consideration.

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides in relevant part:

> A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The moving party bears the burden of proving that no genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. Id. at 587. In doing so, courts must distinguish between evidence of disputed material facts and mere "disputed matters of professional judgment," i.e. disagreement as to legal implications of

12

those facts. <u>Beard v. Banks</u>, 548 U.S. 521, 529 30 (2006). On summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." <u>Id</u>. at 248.

**III.   Discussion**

      **A. The Evidence Before the Court**

      The Court must first determine whether the late-disclosed evidence may be considered on summary judgment. The Court's Scheduling Order set a discovery deadline of February 14, 2014. Prior to that time, plaintiffs' counsel obtained HOME's file, including the 2010 reports by the two testers, but did not timely disclose this information to the defendants as part of the Rule 26 obligation to supplement disclosures and identify potential witnesses in a timely manner. Two days before the deposition of Mr. McGrath on March 14, 2014, plaintiffs' counsel advised defense counsel of the existence of the 2010 reports (of which the defendants were previously unaware). Defense counsel objected several times at deposition to the use of the belated evidence (doc. no. 38 at 11, 15, 19, 43, 46, 50).

      Defendants timely moved for summary judgment on March 31, 2014. Plaintiffs sought (and were granted) several extensions of time to respond. When they responded on May 6, 2014, they attached the late-disclosed 2010 tester

reports and some newly-created affidavits of those testers (doc. no. 48, Affs. of Lewis and Hoffpauir, dated May 1, 2014). Plaintiffs also attached several new affidavits for authentication purposes (Id., Affs. of Brown and Craig). The defendants moved to strike the late exhibits on the basis that Rule 37 does not allow a party to use late-disclosed evidence to support a dispositive motion.

"Striking" material from the record is a drastic remedy that is disfavored and only sparingly used by courts. See Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (6th Cir. 1953). This Court found that removal of the challenged evidence from the record was not warranted and denied the motion on that limited basis (doc. no. 59, Order). See, e.g., Fox v. Mich. State Police Dept., 173 Fed.Appx. 372, 375 (6th Cir. 2006) (explaining that Rule 12 does not require courts "to remove documents other than pleadings from the record in a case").

The Court now addresses the more pertinent issue of whether, for purposes of summary judgment, the challenged evidence must be disregarded due to the plaintiffs' unexcused late disclosure. Defendants point out that Rule 37(c)(1) provides that "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). The defendants correctly assert that the plaintiffs have offered no justification for their failure to disclose this evidence in a timely manner (doc. no. 51 at 3).

At the hearing, plaintiffs' counsel acknowledged that he had received the

14

2010 tester reports prior to the discovery deadline, but had not timely provided them to the defendants. He offered no explanation for the failure to supplement the Rule 26 disclosures before the discovery deadline. Although he provided the reports to the defendants just before the March 2014 deposition, this does not excuse the late disclosure. To the extent the plaintiffs rely on affidavits that were newly-created in May 2014, plaintiffs were admittedly aware of such witnesses during the discovery period. Plaintiffs could have disclosed these potential witnesses and obtained their affidavits in a timely manner, but did not do so. Plaintiffs have offered no justification, much less any "substantial justification," for ignoring their disclosure obligations and the discovery deadline. Where a party fails to disclose evidence in discovery and then seeks to rely on it when opposing a motion for summary judgment, a court may properly disregard that evidence. See, e.g., Gipson v. Vought Aircraft Indus., Inc., 387 Fed. Appx. 548, 554-555 (6th Cir. 2010) (excluding affidavit as sanction under Rule 37(c)(1) for failure to supplement initial disclosures). While the Court has been generous with extensions of time in this case, the parties are expected to follow the Court's Scheduling Order and the federal rules.

At the hearing, plaintiffs' counsel suggested that the late evidence is "not critical" to the plaintiffs' case. This provides no substantial justification, nor does it mean the late disclosure was "harmless" under Rule 37. One purpose of Rule 37 and the Court's Scheduling Order is to allow full discovery to all parties, followed by sufficient time for them to utilize that discovery in their briefs. The suggestion

15

that a last-minute disclosure is "harmless" because the evidence is "not critical" is not persuasive, particularly since the plaintiffs attempt to rely on such evidence in an effort to withstand summary judgment.

Even supposing that Rule 37 did not bar the use of this late evidence, the reports reflect that Mr. McGrath treated the testers similarly. He returned their phone calls, promptly met with them to show the house, was courteous, gave them his card, answered their questions, provided walk-throughs of the property, engaged them in conversation, and followed up by contacting each individual afterwards. He made no comments about race or neighborhood that might suggest any discriminatory motivation. The testers both indicate his demeanor was professional. In sum, the reports do not substantiate any disparate treatment of the testers, and therefore, even if admissible, the reports would not provide any basis to infer that Mr. McGrath had any racial animus regarding the Jones.

Although both testers were shown the house and treated courteously, plaintiffs claim in their brief that Mr. McGrath expressed "greater preference for [Ms. Hoffpauir] as a prospective buyer" and "just went through the motions with Mr. Lewis" (doc. no. 48 at 6, 17). Plaintiffs' subjective characterization is not substantiated by the objective information in the reports. Mr. Lewis indicated "Mr. McGrath was informative and forthcoming with information on the property and was equally involved in the conversation during the tour" (doc. no. 38 at 123). In fact, Mr. Lewis checked "yes" for "Did agent offer to call you back," while Ms. Hoffpauir checked "no" for the same question (doc. no. 48-3 at 7, ¶ 63, and at 15, ¶

16

63). This point actually favors Mr. Lewis, not Ms. Hoffpauir. When viewing the entire test report, any minor differences recorded by the testers do not suggest any sort of racial animus. See, e.g., <u>Fair Hous. Opps. of NW Ohio v. Am. Family Mut. Ins. Co</u>., 684 F.Supp.2d 964, 974 fn. 6 (N.D.Ohio 2010) (observing that "the testing results did not indicate disparate treatment").

To the extent plaintiffs claim that the testers were given slightly different information about the status of the listing, the record reflects that the testers visited one week apart, and that Mr. McGrath gave them accurate information at the time (2014 McGrath Dep., doc. no. 38 at 48-49 explaining that "it had been an expired listing. [The owner] had been trying to sell it for some time. It was off the market. We agreed to leave the sign out, and maybe generate some sign calls with the idea we're going to put it back on the market."). When Mr. McGrath spoke with Mr. Lewis on September 17, he explained that it had been temporarily off the market, but that he could show him the house. In fact, Mr. McGrath arranged to show him the house that same day. A week later, when the next tester inquired, Mr. McGrath explained that the house was back on the market because they had received some calls about it, and that he had shown it to one person the previous week (but had not received an offer). This is accurate information devoid of any racial animus.

Even supposing the belated evidence were admissible, plaintiffs' subjective characterization of it would not be sufficient to withstand summary judgment. A party opposing summary judgment "may not rest upon the mere allegations or

17

denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248; Cox v. Ky. DOT, 53 F.3d 146, 150 (6th Cir. 1995) (observing that Supreme Court precedent provides that "subjective" allegations do not preclude summary judgment). It is well-settled that a nonmoving party may not avoid summary judgment merely by relying on "subjective" beliefs, speculation, or conjecture. Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary judgment, plaintiff cannot rely on conjecture"); Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 724 (6th Cir. 2006) ("conjecture and speculation are insufficient"); Lyons v. Metr. Gov. of Nashville & Davidson Cty., 416 Fed.Appx. 483, 490 (6th Cir. 2011) (same). Here, the objective evidence reflects that the testers were treated similarly. Even if the belated evidence were considered, it would not establish any genuine disputes of material fact.

### B. the Motion for Summary Judgment on the FHA Claim

Defendants assert that they are entitled to summary judgment on the plaintiffs' FHA claim. They argue that Jones were not qualified to lease the house because they were trying to pack too many people in the house, that their rental application was declined for legitimate non-discriminatory reasons (primarily financial), and that the Jones have not shown that such legitimate non-discriminatory reasons were merely a "pretext" for discrimination.

The federal Fair Housing Act ("FHA") provides in relevant part that: "it shall be unlawful – (a) to refuse to sell or rent after the making of a bona fide offer, or to

18

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The plaintiffs allege that the defendants "refused" to rent a house to them due to their race.

A plaintiff may establish a violation of the FHA by showing that the defendant intended to discriminate against the plaintiff on the basis of race ("disparate treatment"). <u>Graoch Assocs. v. L'ville/Jefferson Cty. Metro H.R.C.</u>, 508 F.3d 366, 381 (6th Cir. 2007) (Moore, J., concurring). "To prevail on a disparate treatment claim, a plaintiff must show proof of intentional discrimination." <u>HDC, LLC v. City of Ann Arbor</u>, 675 F.3d 608, 612 (6th Cir. 2012); <u>Hollis v. Chestnut Bend Homeowners Assoc.</u>, --- F.3d ----, 2014 WL 3715088, *5 (6th Cir. (Tenn.)) ("analysis of such a claim focuses on the defendant's intent"). Here, the plaintiffs have no direct evidence of discrimination. Mr. McGrath never made any comments or notes that would indicate any sort of racial basis for declining their rental application. Plaintiffs therefore proceed under the burden-shifting evidentiary framework for claims based on circumstantial evidence (doc. no. 48 at 10-11).

In FHA disparate-treatment cases based on circumstantial evidence, courts apply "the three-part burden of proof test established in McDonnell Douglas." <u>Graoch</u>, 508 F.3d at 371. The Sixth Circuit Court of Appeals has explained that:

> First, the plaintiff must state a prima facie case by showing that he is a member of a protected class, that he applied to and was qualified to rent or purchase certain housing, that he was rejected, and that the housing remained available thereafter... Second, the defendant may then articulate a legitimate non-discriminatory basis for its challenged decision ... Third, if

> **the defendant does proffer such a basis, the plaintiff must establish that the articulated reason is pretextual ... The burden of persuasion always remains with the plaintiff.**

Id. (citing <u>Selden Apts. v. Dept. of HUD</u>, 785 F.2d 152, 160 (6th Cir. 1986) and <u>Maki v. Laakko</u>, 88 F.3d 361, 364 (6th Cir. 1996), cert. denied, 519 U.S. 1114 (1997)).

## C. the Prima Facie Case

The evidence reflects, and the parties do not dispute, that the plaintiffs are members of a protected class (African-American), applied to rent a house managed by the defendants, were rejected, and that the house remained available for sale or lease thereafter.

As for whether the Jones were "qualified" to lease the house, the term "qualified" has been defined as being "ready and able to accept defendants' offer to rent or buy." <u>Campbell v. Robb</u>, 162 Fed.Appx. 460, 475-76 (6th Cir. 2006) (citing <u>Mencer v. Princeton Square Apts.</u>, 228 F.3d 631, 635 (6th Cir. 2000)). The test is an objective one, i.e. the determination of whether a prospective renter is "qualified" is based on objective facts. Id. at 475-76 (finding that a single person was not "qualified" to rent a subsidized three-bedroom residence because Section 8 only allows a single person to have a one-bedroom residence) (citing 24 C.F.R. § 982.402(b)(7) (2005) ("the family unit size for any family consisting of a single person must be either a zero or one-bedroom unit").

In the Proposed Conclusions of Law, the plaintiffs do not dispute the defendants' assertion that the plaintiffs "were not qualified to lease 923 Pond Court" (doc. no. 52 at 15, ¶ 22). If not qualified, that would conclude this case. In

their response brief, however, the plaintiffs address the issue of whether they were qualified (doc. no. 48 at 11, Part E). The Court will therefore consider this issue.

The defendants contend that the plaintiffs were trying to pack too many people (11 people, plus a dog) into the 4-bedroom residence. They point to the International Property Maintenance Code ("I-Code") which sets forth standards for occupancy limits based on square footage. See § 404.5 ("Overcrowding: Dwelling units shall not be occupied by more occupants than permitted by the minimum area requirements" and § 404.4.1 "every bedroom occupied by more than one person shall contain at least 50 square feet (4.6 m$^2$) of floor area for each occupant thereof").[14]

The listing for the house indicates that in addition to the master bedroom, it has three upstairs bedrooms with dimensions of 12 x 10, 12 x 11, and 13 x 11 feet. Under the I-Code standards, the sleeping areas did not have sufficient floor area to put nine children in the upstairs bedrooms. Defendants assert that the house was simply too small for a family of 11 individuals. Mr. McGrath indicates that when he reviewed their application, he was concerned about possible overcrowding and resulting wear and tear on the Patels' house, as well as possible occupancy restrictions (doc. no. 43 at 92, 2013 McGrath Dep. at 90 "When I was talking to Mr. Patel he was concerned about it as well").

---

[14] Although the plaintiffs red-line as "disputed" the defendants' discussion of the I-Codes and the specific standard that "every bedroom occupied by more than one person shall contain at least 50 square feet of floor area for each occupant" (Proposed Conclusions of Law, ¶¶ 14-20), Section 404.4.1 specifically so provides (doc. no. 38 at 101).

The FHA expressly provides that nothing in the statute "limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). This provision was included in the FHA primarily to alleviate concerns that housing providers would have to accommodate families even to the extent of having to violate occupancy laws. City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 735 (1995) ("Maximum occupancy restrictions ... cap the number of occupants per dwelling, typically in relation to available floor space or the number and type of rooms; these restrictions ordinarily apply uniformly to all residents of all dwelling units and are intended to protect health and safety by preventing dwelling overcrowding.") (citing International Conference of Building Officials, Uniform Housing Code § 503(b) (1988)). The Supreme Court pointed out that this part of the FHA was enacted to allay "fears that landlords would be forced to allow large families to crowd into small housing units" (Id. at 735, fn.8 "Section 3607(b)(1) makes it plain that, pursuant to local prescriptions on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters."); see also, Fair Housing Adv. Assoc, Inc. v. City of Richmond Hts., Ohio, 209 F.3d 626, 638 (6th Cir. 2000) (affirming summary judgment to defendants, finding that the maximum occupancy ordinances were "reasonable" for purposes of the FHA). The Supreme Court has emphasized that "rules that cap the total number of occupants in order to prevent overcrowding of a dwelling 'plainly and unmistakably' fall within § 3607(b)(1)'s absolute exemption from the FHA's governance." City of

**Edmonds**, 514 U.S. at 735 (quoting **A.H. Phillips, Inc. v. Walling**, 324 U.S. 490, 493 (1945)).

The plaintiffs do not challenge the I-Code occupancy standards referred to by the defendants. Instead, they point to an Ohio regulation for the protection of foster children, OAC § 5101.2-7-05(B)(2), that provides that "a bedroom for foster children shall accommodate no more than four children" (doc. no. 48 at 8). Plaintiffs argue that with two parents in the master bedroom and four children in each of the other three bedrooms, the Patels' house could hold up to 14 people. Plaintiffs do not address the square footage standards of the I-Code or cite any occupancy regulations in Lebanon, Ohio.[15]

The defendants point out that the bedrooms must still be adequate in size to hold this maximum number of children. They assert that, when read together in a logical manner, the I-Code standard and the Ohio foster regulations mean that, if a room is large enough, it could hold up to four children. They assert that "the correct way to interpret OAC § 5101:2-7-05(B)(2) is in conjunction with International Property Maintenance Code § 404.4.1; up to 4 children, and no more, may abide in a large bedroom of 200 square feet or more, but a smaller space may not accommodate more than one child unless the room has at least 50 square feet of space per occupant" (doc. no. 50 at 4).[16]

---

[15] Mrs. Jones indicates that she "knows from personal experience with the process that that (sic) the county regulations permit a two-parent family in a four-bedroom house to care for up to 10 children," but cites no regulation (doc. no. 48-8, K. Jones Decl. ¶ 35).
[16] Although the I-Codes have been widely adopted as law across the nation,

23

Plaintiffs base their response on their own understanding of the regulation governing foster care in the state of Ohio, but do not address other pertinent parts of the same regulation. They ignore the fact that the regulation further specifies that foster children over the age of five who share a bedroom must be of the same sex. OAC § 5101.2-7-05(C). Plaintiffs do not mention the age and sex of the nine children living with them at the time of their rental application. Plaintiffs were bound to comply with the applicable regulations for the protection of foster children. Moreover, the largest part of the Jones' income (and ability to pay their rent) was derived from receiving payment from Children's Services for the care of the six foster children. In other words, in order to continue caring for this number of foster children and in order to continue receiving monthly payment for doing so, the Jones had to comply with the regulations for appropriately housing those children. Plaintiffs have not shown that the 4-bedroom house they sought to rent would have met the requirements of those regulations, and thus, that they were qualified (i.e. "ready and able") to rent that property.

The defendants point out that under the foster care regulation that plaintiffs themselves cite as authority, the Patels' house could not accommodate all the children. Although plaintiffs indicate they liked the house because it had four bedrooms and "a big basement" for the children (K. Jones Aff. ¶ 35), defendants

including specific locations in Ohio, the record here does not indicate whether the I-Code occupancy standards have been adopted into law by the City of Lebanon. Even so, such widely-known standards could properly inform Mr. McGrath's concern about overcrowding. Mr. McGrath indicates that he and Mr. Patel were both concerned at the time about the large number of people that the Jones wanted to place in the home.

correctly point out that the Jones "could not have lawfully alleviated the overcrowding of the bedrooms by sticking some of the children in the basement" (doc. no. 40 at 14). The regulations for the protection of foster children specifically forbid this. See OAC 5101:2-7-05(B)(8) ("A bedroom for foster children shall: not be ... in a basement ..."). The plaintiffs do not dispute this in the Proposed Conclusions of Law (doc. no. 52 at 15, ¶ 21 "applicable housing codes prohibit using other spaces as bedrooms ... plaintiffs could not have lawfully alleviated the overcrowding of the bedrooms by sticking some of the children in the basement"). Plaintiffs are presumably aware of this, as they indicate they are knowledgeable about the rules for foster care and their previous home had five bedrooms (doc. no. 48 at 8).

For purposes of making a prima facie case, the plaintiffs have the burden to show that they were "qualified," i.e. "ready and able" to lease the premises. Plaintiffs' citation of a portion of a foster care regulation does not establish that they could permissibly house all the foster children in the rental home at issue, nor does it meet the initial burden at the prima facie stage to show that they were ready and able to rent the home. Plaintiffs' statements that they were "qualified" are entirely conclusory (doc. no. 48-8 at 2, ¶ 13). Plaintiffs have not shown that they could place this many children in the rental house under the foster regulations.

### D. Legitimate, Non-Discriminatory Reasons

Even assuming a prima facie case, the defendants have articulated legitimate, non-discriminatory reasons for declining plaintiffs' rental application:

       **-- Plaintiffs had no interest in a purchase option, an important consideration to the property owner;**
       **-- the unkempt condition of plaintiffs' then-current residence;**
       **-- too many occupants, crammed into too few bedrooms, plus a dog;**
       **-- Plaintiffs' history of late bill payment, to the point of being pursued by multiple collection agencies;**
       **-- their then-current landlord informing Mr. McGrath that Plaintiffs paid their rent late on multiple occasions.**

**Mr. McGrath has consistently indicated that although he had multiple concerns about the Jones' application, he denied it primarily for financial reasons (2013 McGrath Dep., doc. no. 43 at 21, 93, 96; 2014 McGrath Dep., doc. no. 38 at 77, 104, and McGrath Aff. ¶¶ 19-20, 22).**

       **E. Pretext**

       **The evidentiary burden then shifts to the plaintiffs to point to evidence that the stated reasons: (1) had no basis in fact, (2) were not the actual reasons, or (3) were insufficient to explain the action. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009)). Although plaintiffs' brief suggests that "plaintiffs are not required to prove racial animus" (doc. no. 48 at 17), they bear the burden of pointing to evidence that demonstrates the existence of genuine disputes of material fact as to whether the defendants' legitimate non-discriminatory reasons were merely a pretext for discrimination.**

       **It is undisputed that the plaintiffs were not interested in a purchase option and informed Mr. McGrath of this. Plaintiffs have not pointed to any evidence to dispute the testimony that the lease purchase option was an important**

Case: 1:12-cv-00946-HJW Doc #: 63 Filed: 09/05/14 Page: 27 of 32  PAGEID #: 936
consideration to the Patels. Mr. McGrath testified that "renting" was the least attractive option to the Patels (doc. no. 38 at 40).

Plaintiffs point to no evidence to dispute that their former rental was in "unkempt" and/or "poor" condition when Mr. McGrath viewed it.

Although the Jones suggest that they could put up to four foster children in each upstairs bedroom (without reference to the size of the room), their reliance on part of a foster care regulation is not evidence showing that Mr. McGrath's concern about "too many occupants, crammed into too few bedrooms, plus a dog" (and resulting wear and tear on the house) was merely a pretext for discrimination.

Turning to the financial considerations, it is undisputed that the Jones had a history of late bill payment. They admittedly had multiple past due debts that were subject to collection. They attached bill collection letters to their application showing that certain past due bills had been paid off in 2010. The letters indicated that the Jones had been past due on various consumer accounts, resulting in collection efforts. The fact that the Jones had eventually paid these bills is beside the point. The record plainly shows that they had a history of late payments. Mr. McGrath was aware of this information. Mrs. Jones acknowledges that Mr. McGrath referred to the collection items on their credit history when he advised her that their application was declined.

Although the plaintiffs allege that they "have never made a late rent or mortgage payment" (doc. no. 48-7 at 2, ¶ 11, K. Jones Aff.), they acknowledge that foreclosure proceedings were filed against them. By definition, foreclosure occurs

when a person has defaulted on their mortgage payments. See Black's Law Dictionary (9th ed. 2009) (defining "default" as "the failure to pay a debt when due"). Plaintiffs admit that they were unable to afford their previous mortgage payments. In addition to the plaintiffs' foreclosure problems in 2003, Mr. McGrath found more recent court filings in 2008 regarding the Jones' tax delinquency. Even construing the evidence in the light most favorable to plaintiffs, they have not shown that Mr. McGrath's concern about their reliability in making payments had "no basis in fact", was not the "real reason," or was "insufficient" to explain his recommendation. Plaintiffs have not pointed to objective evidence suggesting that declining their rental application for financial reasons was merely a "pretext" for discrimination.

This brings us to the last articulated consideration of Mr. McGrath -- that the Jones then-landlord informed him that the Jones had paid their rent late multiple times. Mr. McGrath had noted "several late pays, slow pay" on Ms. Buck's email and "not ok, some late pay" on their application (doc. no. 38 at 87, 91). Even assuming that this refers to the rent payments (as opposed to other late bill payments of record), the Jones acknowledge that "twice, our landlord Mark Armstrong agreed to let us split our rent into two payments." They contend that they were not actually "late" in paying and have submitted an affidavit of Mr. Armstrong to that effect, i.e. he was willing to accept timely partial payments (doc. no. 48-1 at ¶¶ 6-8, indicating that when Mr. McGrath called and asked if the Jones paid their rent on time, he told him "a couple of times they asked in advance to

28

break their payment into two payments that month, instead of on its due date"). Whether these payments were properly characterized as "slow and/or late" or were merely "irregular," it is undisputed that the Jones did not pay their rent as they had agreed under their rental contract. The Jones' requests to make irregular partial payments (even if the landlord agreed to accept them) would tend to suggest possible financial difficulties, particularly in light of the Jones' history of foreclosure (2003), tax delinquency (2008), and multiple past-due debts in collection (albeit paid off in 2010). The financial information before Mr. McGrath, including the landlord comments, provided legitimate reasons to decline the Jones' rental application. Plaintiffs have not shown that Mr. McGrath's concerns about their reliability in making payments were pretextual.

The plaintiffs' contention that Mr. McGrath's stated reasons were not the "real reason" is a subjective belief not supported by any evidence. The Sixth Circuit Court of Appeals has repeatedly explained that a "nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence." Lyons, 416 Fed.Appx. at 490 (quoting Cox v. Ky. DOT, 53 F.3d 146, 150 (6th Cir. 1995)). For example, although the Jones question Mr. McGrath's motivation in asking them about a different term of lease, this is not "discriminatory." Just as the Jones' realtor (Sara Bush) could inquire about whether the amount of rent was "negotiable," the Patels' realtor (Mr. McGrath) could inquire about whether the plaintiffs were interested in a shorter length of

lease (particularly since the listing contract indicated he was authorized to seek a one-year lease). Contrary to plaintiffs' suggestion, this raises no inference of discrimination. Plaintiffs' contention that such inquiries were pretextual is mere speculation.

Similarly, the Jones also suggest (based on their own belief that Mr. McGrath was going to approve their application) that he "changed his mind" and did not approve their application after he met with them. They attribute this to racial animosity. The problem with this argument (indeed, their entire case) is that it is largely based on their own subjective belief, whereas the objective evidence shows that Mr. McGrath had not yet approved their application and had sound (non-discriminatory) financial reasons for declining their application.

Finally, plaintiffs argue that the "best evidence that defendants (sic) reasons are pretextual is their protean nature" (doc. no. 48 at 12). Contrary to such suggestion, the record does not reflect "changing" reasons. Mrs. Jones acknowledges in her declaration that Mr. McGrath has asserted "since June of 2010" that they wanted to put too many people in the house (doc. no. 48-8 at 4, K. Jones Decl. ¶ 35). Mr. McGrath has consistently asserted that he was concerned about various factors (all of them legitimate and non-discriminatory), but declined the Jones' application primarily for financial reasons relating to their reliability in making payments (2013 McGrath Dep., doc. no. 43 at 93, Q: And you had said that your recommendation was primarily based on the financial issues that you had found with their application, the Jones' application, is that correct? A: That's

30

correct.). After considering all the information before him, he indicates he based his recommendation to Mr. Patel primarily on the financial information (Id. at 21 indicating that "reliability on their payments" was the most important factor). Mrs. Jones acknowledges that when Mr. McGrath called her on June 16 to advise that their application was declined, he told her the reason was financial, i.e., "the items on their credit report." The fact that he had various concerns about their application (and has repeatedly explained them) does not mean that the reasons have "changed." This is simply a mischaracterization by plaintiffs' counsel and does not raise any permissible inference of discriminatory intent.

Although the Jones attached bill collection letters regarding paid-off debts to their application, they now argue that "the application does not call for any past payment history of bills" (doc. no. 48 at 15). This argument makes little sense. The Jones voluntarily provided information about their past financial problems, and Mr. McGrath could properly consider such information. The Jones' own letter discussed various collection items on their credit report, as well as the foreclosure proceedings against them. Although they intended this to illustrate that they had paid off some past-due debts, they can hardly expect a prospective landlord to ignore the fact that they had recently had multiple bills in collection. While it is commendable that plaintiffs were attempting to remedy their past delinquencies, it does not mean that their financial history of late payments was not significant (and legitimately so) to Mr. McGrath. Throughout this litigation (and the state case), he has consistently maintained that he had various concerns, but was most

31

concerned about the Jones' reliability in making payments. This is consistent with the Home Information Networks' stated objective of finding tenants qualified "based on their ability to consistently pay rent on time as agreed in rental agreement and their ability to maintain the premises in a safe and orderly condition" (<u>Id</u>.). The Jones have not pointed to evidence suggesting that these legitimate concerns were pretextual.

In sum, the plaintiffs have not presented sufficient evidence from which a trier of fact could infer that racial discrimination was a motivating factor in the denial of their rental application. Even supposing the plaintiffs had established a prima facie case, their case fails at the pretext stage. Defendants are entitled to summary judgment on the FHA claim.

Accordingly, the defendants' "Motion for Summary Judgment" (doc. no. 40) is <u>GRANTED</u>. This case is DISMSSED and TERMINATED on the docket of this Court.

IT IS SO ORDERED.

<u>        s/Herman J. Weber     </u>
Herman J. Weber, Senior Judge
United States District Court

32